United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 23, 2003**

Charles R. Fulbruge III
Clerk

Revised July 7, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 02-40524

AMERICAN INDEMNITY LLOYDS,

Appellant,

versus

TRAVELERS PROPERTY & CASUALTY,

Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, JONES, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

In this Texas law diversity case, plaintiff-appellant American Indemnity Lloyds (AIL) seeks to recover from defendant-appellee Travelers Property & Casualty (TPC) one-half of the sums AIL paid in settlement and expended in defense of a personal injury damage suit against a contractor who was both the named insured in TPC's policy and an additional insured in AIL's policy. The named insured in AIL's policy was the subcontractor whose employee had

brought the underlying suit for on-the-job injuries which were within the scope of the subcontractor's agreement to indemnify the contractor, TPC's named insured. AIL appeals the district court's summary judgment dismissing its suit with prejudice. We affirm.

## Facts and Proceedings Below

In September 1994 the subcontractor, Elite Masonry, Inc. (Elite), entered into a subcontract with the contractor, Caddell Construction Company, Inc. (Caddell), by which Elite agreed to provide masonry services to Caddell in connection with Caddell's work on the construction of a prison in Beaumont, Texas. Article XII(a) of the subcontract is an indemnity provision which provides that:

> "[Elite] agrees to indemnify [Caddell] against and hold [Caddell] harmless from any and all claims, demands, liabilities, losses, expenses, suits and actions (including attorneys fees) for or on account of any injury to any person . . . which may arise (or which may be alleged to have arisen) out of or in connection with the work covered by this Subcontract, *even though such injury . . . may be (or may be alleged to be) attributable in part to negligence or other fault on the part of [Caddell]* or its officers, agents or employees. *This obligation to indemnify* and hold [Caddell] harmless *shall not be enforceable if*, *and only if, it be determined by judicial proceedings that the injury*, death, or damage *complained of was attributable solely to the fault or negligence of [Caddell]* or its officers, agents, or employees. [Elite] agrees to defend all claims , suits, and actions against [Caddell] (in which connection [Elite] shall employ attorneys acceptable to [Caddell]) on account of any injury, death or damage and shall reimburse [Caddell] for all expenses, including reasonable attorney fees, incurred by reason of such claim, suit or action or incurred in seeking indemnity or other recovery from [Elite] hereunder." (emphasis added).

The subcontract's Article XII(b) required that Elite "procure at [its] expense prior to commencement of any work hereunder, and . . . maintain for the duration of this subcontract, public liability insurance and also such employer's liability or workmen's compensation insurance as may be necessary to ensure the liability of the parties hereto for any injuries to [Elite's] employees." The subcontract has no requirement that Caddell procure or maintain any insurance.

On March 16, 1996, Mariano Alas (Alas), an employee of Elite, was injured while performing work pursuant to the subcontract. Some time in early 1998 Alas, individually and as next friend of his minor children, filed suit for damages against Elite and Caddell in respect to the injuries he had thus received, claiming negligence and gross negligence.

At the time of Alas's injury, and when his suit was filed, Elite was the named insured under a commercial general liability insurance policy issued by AIL having primary limits of $1,000,000. Caddell was then an additional insured under this AIL policy.[1] Caddell was also then the named insured under a commercial general liability insurance policy issued by Aetna Casualty & Surety Company (Aetna) and having primary limits of $1,000,000. Elite was *not* an insured, named or otherwise, under the Aetna Policy. There

_____

[1]The AIL policy provides that an additional insured under the policy would be "Any person or organization . . . you [Elite] have agreed to name as an additional insured by written contract or agreement if the contract or agreement is executed prior to loss."

3

is no allegation or evidence that prior to Alas's injury AIL was aware of the existence of the Aetna policy. At some point after March 16, 1998, TPC, pursuant to its purchase of some or all of Aetna Casualty lines of insurance, succeeded to all of Aetna rights and obligations under the Aetna policy. Each of the two policies – the AIL policy and the Aetna/TPC policy – contained identical "other insurance" clauses.[2] The parties do not dispute that the

---

[2]These clauses each state:

"a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. **Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

4

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers."

[3]The AIL policy's "Insuring Agreement" provides in part "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages." The AIL policy's "Exclusions" provide in part as follows:

"This insurance does not apply to:

. . .

b. **Contractual Liability**

'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1)     Assumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage'

indemnity and defense coverage for such amounts as Elite might be obligated, under the indemnity provisions of the subcontract, to pay Caddell as reimbursement for payments made by Caddell to discharge or settle the claims made against Caddell in the Alas lawsuit. *See, e.g., Gibson & Associates, Inc. v. Home Ins. Co.,* 966 F. Supp. 468, 475-77 (N.D. Tex. 1997). But these "insured contract" provisions of AIL's policy at least arguably did not afford Elite indemnity coverage for such amounts as Elite might be obligated, under the subcontract's indemnity clause, to pay Caddell as reimbursement for attorney's fees and expenses incurred by Caddell in defense of Alas's claims against Caddell in the Alas lawsuit.

The parties likewise do not dispute that the Aetna/TPC policy subrogated TPC to Caddell's rights against Elite under the subcontract's indemnity clause to the extent of any payments TPC would make under its policy to indemnify or defend Caddell in respect to the claims against Caddell in the Alas lawsuit.[4]

---

occurs subsequent to the execution of the contract or agreement; . . ."

The AIL policy defines "Insured Contract" as including "That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization."

[4]The Aetna/TPC policy provides: "If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them." Such subrogation would be available to TPC for

TPC initially undertook the defense of Caddell in the Alas lawsuit. Pursuant to demand by TPC, AIL in October 1998 assumed the defense of and agreed to indemnify Caddell in the Alas lawsuit, and TPC thereafter withdrew from that representation.[5] At some time prior to May 2, 2000 (just when is not reflected in the record), the Alas plaintiffs nonsuited Elite, leaving Caddell as

---

amounts it would pay notwithstanding that no such payment was or would actually be made by Caddell (in the first instance or otherwise). *See, e.g., Rushing v. Int. Aviation Underwriters*, 604 S.W.2d 239, 243-44 (Tex.Civ.App. Dallas, 1980; n.r.e.); *General Star Indem. Co. v. Vista Fire Ins. Co.,*, 173 F.3d 946, 949-50 (5th Cir. 1999) (Texas law); *Sharp v. Wausau Ins. Cos.*, 917 F.2d 885, 890 (5th Cir. 1990).

[5]On October 13, 1998, AIL wrote TPC's counsel in respect to Alas's lawsuit stating in part as follows:

> "Please accept this letter as our response to your demand that we defend and indemnify on behalf of Caddell Construction Company.
>
> Please note that we have reviewed the language in the contract between Caddell Construction Company and Elite Masonry and find that it does not meet the standards set forth in the Ethyl case.
>
> We point out however that Caddell Construction Company is an additional insured under our policy. Because of this American Indemnity Group will assume the defense and indemnify Caddell Construction Company in the above case."

It is undisputed that the second sentence in the above quotation relates to the indemnity agreement in the Caddell-Elite subcontract and reflects AIL's then position that the indemnity agreement was invalid because it did not meet the "express negligence" requirement for indemnity contracts adopted by the Texas Supreme Court in *Ethyl Corp. v. Daniel Construction Co.*, 725 S.W.2d 705, 708 (Tex. 1987).

In connection with its assumption of the defense of Caddell in the Alas lawsuit, AIL reimbursed TPC its attorney's fees and costs incurred to that time in TPC's defense of Caddell in that suit.

the sole defendant.[6]

After assuming the defense of Alas's suit, AIL kept TPC advised of the progress of the case. On July 12, 2000, AIL placed TPC on notice of AIL's position that the AIL policy and the Aetna/TPC policy provided concurrent primary coverage for Caddell in the Alas lawsuit and that AIL took the position that it "has and retains the right to seek contribution from" TPC for "all amounts it [AIL] has paid and will pay in defense and settlement of this claim." TPC did not respond, and declined AIL's invitation to participate in negotiations to settle the Alas lawsuit. On July 25, 2000, AIL settled the Alas suit for a total of $625,000, the entirety of which sum was paid by AIL. It was stipulated in the present suit that this was a reasonable settlement and that AIL reasonably expended $230,163.71 in legal fees and costs in the defense of Caddell in the Alas suit. Following the Alas suit settlement, AIL demanded that TPC reimburse it half the $625,000 AIL paid to settle the Alas suit and half AIL's attorneys' fees and costs incurred in connection with its defense of Caddell in that

---

[6]Plaintiffs' Fifth Amended Original Petition in the Alas suit (the only document from the record in that suit copy of which is in this record) is dated May 2, 2000, and Caddell is the only named defendant therein. It alleges that Caddell was negligent and grossly negligent "in supervising the site and maintaining a safe work environment" (by, among other things, "failing to . . . monitor the safety of contractors and subcontractors" and "failing to be observant for unsafe acts and/or conditions") and that Caddell "negligently hired, supervised and retained Elite Masonry, Inc. as a subcontractor at the subject work site" when Caddell "knew, or in the exercise of reasonable care, should have known that Elite masonry, Inc. was not competent, qualified and/or capable of safely performing its work duties at the subject work site," which was "a proximate cause of Plaintiffs' injuries."

case.  TPC did not respond to those demands.

In June 2001, AIL filed this suit against TPC in the district court below, predicating jurisdiction on diversity of citizenship. It sought declaratory judgment that it was entitled to recover from TPC one-half the sums AIL had paid to settle and to defend Caddell in the Alas lawsuit; it also sought a money judgment against TPC for those sums.  AIL alleged it was entitled to such relief based on the "other insurance" provisions common to its policy and the Aetna/TPC policy (see note 2, *supra*).

At a pretrial conference, the parties and the district court agreed that each party would file a summary judgment motion after an initial discovery period and that the case would be decided on the basis of those motions.  AIL's motion relied upon the "other insurance" clauses, whereas TPC's motion was based on the subcontract's indemnity provision.  As indicated above, most of the relevant facts were stipulated, including the provisions of the subcontract and the fact "there was no judicial determination of fault or negligence in the Alas lawsuit."  TPC took the position that "[t]here was no adjudication of fault" respecting the Alas injury "prior or subsequent to settlement" of the Alas lawsuit. AIL at no time alleged that there had ever been, in the Alas lawsuit or otherwise, any judicial determination of fault in respect to Alas's injury alleged in the Alas lawsuit, nor did AIL allege that it had ever previously sought to have such a

9

determination made; nor did it seek to have any such determination made in the instant suit.  Rather, AIL took the position below that "the issue of fault as to Caddell, Elite and the plaintiff in the underlying case is not before this court.  Because the underlying case was settled, a determination of fault at this stage is impossible" and "the issue of fault, as a practical matter, cannot be determined at this point."

The district court granted TPC's motion for summary judgment. On its appeal to this Court AIL argues that the district court erred in holding that the indemnity provision was controlling.

## Discussion

As the material facts are not in genuine dispute and only questions of law are presented on this appeal, our review is *de novo*.  *Mowbray v. Cameron County, Texas*, 274 F.3d 269, 278-79 (5th Cir. 2001).

AIL contends that by virtue of the identical "other insurance" clauses in each policy (see note 2 *supra*) under which each policy provided primary coverage to Caddell (the named insured in the Aetna/TPL policy; an additional, unnamed insured in the AIL policy) respecting the Alas lawsuit, and because AIL paid the entire cost of settlement and defense of the claims against Caddell in that suit, AIL is entitled to recover from TPL half the amount AIL so expended, and that this result is not changed by virtue of the indemnity provisions of the subcontract between Alas's employer

Elite (the named insured in AIL's policy) and Caddell or that fact that Elite's obligation thereunder to hold Caddell harmless from Alas's claims was covered by the "insured contract" provisions of the AIL policy. TPC relies on the indemnity agreement in Elite-Caddell subcontract and its status as an "insured contract" under AIL's policy.[7]

Both parties agree that Texas law controls, but neither cites any case applying Texas law which they contend to be directly in point. Nor has our independent research disclosed any such case. We are accordingly required to follow the rule we believe the Texas Supreme Court would adopt, and in making that *Erie* "guess", we consider, among other sources, "treatises, . . . decisions from other jurisdictions . . . and the 'majority rule'." *See, e.g., Jackson v. Johns-Mansville Sales Corp.*, 781 F.2d 394, 398 (5th Cir. 1986); *Texas Employers Ins. v. Underwriting Members*, 836 F. Supp. 398, 406 (S.D. Tex. 1993).

*Other Insurance Clauses*

The general rule appears to be that, as AIL contends, where each of two liability insurance policies issued by different

---

[7]The district court ruled that the indemnity agreement was valid and enforceable according to its terms under Texas law, which is concededly applicable, and met all the requirements of the Texas express negligence and conspicuousness doctrines as set forth in *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 708 (Tex. 1987); *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8, 9 (Tex. 1990); and, *Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 510-11 (Tex. 1993). The district court's holdings in this respect are plainly correct and AIL does not challenge them on this appeal.

insurers provides primary coverage to the same insured in respect to the claim in question and contains mutually consistent "other insurance" provisions similar to those in the policies here, the insurer paying more than its share (generally either one half or the fraction that the limits of its policy is of the total of the limits of both policies) of the claim is ordinarily entitled to recover from the other insurer for the excess so paid. *See, e.g., Employers Casualty Company v. Employers Commercial Union Insurance Co.*, 632 F.2d 1215, 1218 (5th Cir. 1981) (Alabama law); *Aviles v. Burgos*, 783 F.2d 270 (1st Cir. 1986). This likewise appears to be the general rule in Texas. *See, e.g., Texas Employers Ins.* at 404, n. 5 & 6 and cases cited. Under Texas law such recovery is not based on the theory that the separate policies create any contract between the two insurance companies issuing them to a common insured, nor upon common law contribution, but rather upon conventional or equitable subrogation to the rights of the common insured against the nonpaying insurer. *See, id.; Employers Casualty Co. v. Transport Ins. Co.*, 444 S.W.2d 606, 610 (Tex. 1969).[8]

*Indemnity Exception*

However, the foregoing general rule is subject to an equally widely recognized exception for cases in which the policy of the

---

[8]Such subrogation recovery would normally be subject to the nonpaying insurer's policy's limits and other relevant policy provisions.

insurer seeking to invoke the "other insurance" clauses also covers another insured who is liable to indemnify the insured in the policy of the other insurer. Thus, a well recognized commentator observes: "an indemnity agreement between the insureds or a contract with an indemnification clause, such as is commonly found in the construction industry, may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." 15 Couch on Insurance (3rd Ed. 1999; Russ & Segalla) § 219.1 at 219-7.

As noted in *Wal-Mart Stores Inc. v. RLI Ins. Co.*, 292 F.3d 583, 588-94 (8th Cir. 2002), the clear majority of jurisdictions recognizes the foregoing exception and gives controlling effect to the indemnity obligation of one insured to the other insured over "other insurance" or similar clauses in the policies of the insurers, particularly where one of the policies covers the indemnity obligation. We believe Texas would follow this well recognized exception to the general rule. We note some of the many decisions that have done so.

In *Wal-Mart Stores*, an Arkansas law diversity case, Cheyenne agreed to supply Wal-Mart with halogen lamps which Wal-Mart sold at retail. This agreement required Cheyenne to carry liability insurance and also to indemnity Wal-Mart from any liability arising from its sale of the lamps. One of these sold by Wal-Mart misfunctioned, causing a fire and personal injury to Jasmine

13

Boykin, who sued Wal-Mart and Cheyenne in state court. Cheyenne had procured insurance covering itself and Wal-Mart from both St. Paul, which provided $1 million primary coverage, and RLI, which provided $10 million excess coverage over the St. Paul coverage. The RLI policy additionally covered Cheyenne's contractual indemnity obligation to Wal-Mart. Wal-Mart was also covered by its own $10 million policy with National Union, which did not cover Cheyenne. The Boykin suit was settled for $11 million, $1 million of which was paid by St. Paul, whom all agreed was fully responsible for that payment, and the entire remaining $10 million was paid by RLI under a reservation of rights. Wal-Mart and National Union sued RLI in federal court for declaratory judgment that neither was obligated for any part of the settlement; RLI counterclaimed seeking contribution for all or part of the $10 million it had paid. The RLI policy provided that it was excess to any non-scheduled policy and the National Union policy was not scheduled in the RLI policy. The National Union policy provided that it was primary (with certain specified exceptions all of which the Court of Appeals assumed, *arguendo*, were inapplicable). The Eighth Circuit held that National Union was not obligated to contribute anything to the Boykin settlement (and neither was Wal-Mart).

Relying in part of the above quoted passage from *Couch on Insurance*, *see Wal-Mart Stores* at 588, the court held that "when we

14

analyze the parties obligations under both the insurance contracts and the indemnity agreement, we conclude that the indemnity agreement controls the outcome of this case." *Id.* at 589. The court rejected RLI's argument that the indemnity agreement should not control because Cheyenne had not been found liable to Wal-Mart and was not a party to the federal case. *Id.* The court also observed that "[w]e fail to see why RLI deserves the benefit of being 'excess' to National Union, an insurer it knew nothing about" and "RLI has introduced no evidence that it knew whether Wal-Mart had other insurance to cover liability from the sales of the halogen lamps, or the extent of any such coverage." *Id.* at 592, 593. And, the court further concluded that allowing RLI any recovery from National Union (or Wal-Mart) "would produce circuitous litigation that would still result in RLI being ultimately liable for the $10 million." *Id.* at 593. If RLI could require National Union to pay it, then National Union would be subrogated to Wal-Mart's contractual indemnity rights against Cheyenne and RLI "would have made its insured [Cheyenne] liable to itself, an insurer, for a covered loss", while "[i]f Cheyenne succeeded in getting RLI to cover the $10 million claim resulting from the enforcement of the indemnity provisions, the parties would be back in the situation they were in before this action was brought–RLI is liable for the $10 million Boykin settlement." *Id.* at 594. The court concluded by stating:

15

> "We think this potential circuity of action is significant, in that it reveals the true nature of the parties' obligations and relationships with each other. RLI will ultimately be liable for the $10 million because of Cheyenne's promise to indemnify Wal-Mart and RLI's contractual-liability coverage in its policy covering Cheyenne. To prevent such wasteful litigation and to give effect to the indemnification agreement between the parties, we hold that RLI cannot recover against National Union . . . ." *Id.*

The holding and reasoning of the well considered *Wal-Mart Stores* opinion is fully applicable here.

Another similar case to that now before us is *J. Walters Const. Inc. v. Gilman Paper Co.*, 620 So.2d 219 (Fla. App. 1993). There, Walters contracted with Gilman to perform construction work at a Gilman plant. The contract provided that Walters would hold Gilman harmless from any claims for injury arising from the work and would procure liability insurance covering Gilman in respect to the work. Walters procured insurance with CNA in which Walters was named insured and Gilman was an additional insured. Gilman also procured its own policy written by Liberty Mutual (in which Walters was apparently not an insured). An employee of Walters was injured on the job and sued Gilman, which settled and sued to recover from CNA the entire amount paid in settlement. Both the CNA and the Liberty Mutual policies covered Gilman in respect to the employee's suit and "both policies" had similar "other insurance" clauses "to the effect that if other coverage is available, then coverage for only half of the claim will be provided." *Id.* at 220-21 & n.1. The court, applying Georgia law, held that CNA was obligated for

16

the entire amount paid in settlement of the Walters employee's suit against Gilman, and Liberty Mutual did not have to share any part of that, because "to apply the 'other insurance' provisions to reduce CNA's liability would serve to abrogate the indemnity agreement between Walters and Gilman" and the agreement "that Walters would hold Gilman harmless and that Walters would secure insurance" reflected "their mutual intent to have any claim arising out of the contracted work paid exclusively by the insurance procured by Walters, without contribution by Gilman's insurer, Liberty Mutual." *Id*. at 221.[9]

Another leading case in this area is *Rossmoor Sanitation Inc. v. Pylon Inc*., 119 Cal. Rptr. 449, 13 Cal. 3rd 622, 532 P.2d 97 (Cal. 1975). There, Pylon had contracted with Rossmoor to construct a pump station and sewer lines for Rossmoor. In the contract Pylon agreed to indemnify Rossmoor for all claims for damages arising out of the work, including attorneys' fees and expenses incurred in defending damage suits, and Pylon also agreed to obtain liability insurance for itself and to name Rossmoor as an additional insured. Pylon procured insurance with U.S. Fire covering Pylon and designating Rossmoor as an additional insured. Rossmoor also had independent coverage under a policy (which did not cover Pylon) previously issued by its own insured, INA. The

---

[9]The opinion does not, however, suggest that the CNA policy insured Walters's liability to Gilman under the indemnification provisions of the construction contract.

17

U.S. Fire and INA policies each purported to provide Rossmoor primary coverage, and each had identical other insurance clauses providing for apportionment of loss if the insured has other insurance covering the claim.  Two Pylon employees were injured while performing work under the contract and sued Rossmoor.  INA paid the resulting judgment against Rossmoor and bore the costs of defense.  Thereafter, Rossmoor sued Pylon and U.S. Fire seeking indemnity; "U.S. Fire cross-complained against INA, seeking an apportionment of the sums between the carriers pursuant to the 'other insurance' clauses."  *Id*., 532 P.2d at 99.  The trial court, relying on the construction contract's provisions, ruled that "as the U.S. Fire policy was part of the consideration for the job, it provided primary coverage to Rossmoor; that the *INA policy was merely excess*; and that neither Pylon nor U.S. Fire was entitled to any benefits or setoffs by reason of the INA coverage."  *Id*. (emphasis added).  The California Supreme Court affirmed.[10]  It held

---

[10]The trial court also held that the indemnity agreement validly obligated Pylon to indemnify Rossmoor because Rossmoor's negligence was merely passive, namely "failing to discover that Pylon employees intended to enter an unshored trench."  *Id*. at 99.  The California Supreme Court affirmed this ruling.  It noted that under its decisions "an indemnity agreement may provide for indemnification against an indemnitee's own negligence, but such an agreement must be clear and explicit and is strictly construed against the indemnitee. (citation).  If an indemnity clause does not address itself to the issue of an indemnitee's negligence, it is referred to as a 'general' indemnity clause. (citation).  While such clauses may be construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, they will not be interpreted to provide indemnity if an indemnitee has been *actively* negligent."  *Id*.  It went on to hold that

> "[s]ince the agreement does not state what effect Rossmoor's negligence will have on Pylon's obligation to indemnify, the clause is a 'general' indemnity provision,

18

that the identical "other insurance" clauses in the U.S. Fire and INA policies, which each purported to provide Rossmoor primary coverage, did not control or relieve U.S. Fire of the obligation to fully reimburse INA for the entire amount of the judgment in underlying suit. The court stated:

> "It appears that both INA and U.S. Fire calculated and accepted premiums with knowledge that they might be called upon to satisfy a full judgment. There is no evidence that either company knew there was or would be other insurance when they issued the policies. The fact that there is other insurance is a mere fortuitous circumstance. We view one factor as compelling, however: *to apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement* and impose liability on INA when Rossmoor bargained with Pylon to avoid that very result as part of the consideration for the construction agreement. We therefore conclude that *the rights of indemnity* and subrogation *must control*, and are persuaded the *trial court was correct* in *finding that* because *the U.S. Fire policy* was part of the consideration for the construction job, it *must be viewed as primary insurance* under the facts of this case and that INA was subrogated to the rights of Rossmoor." *Id*. at 104-05 (emphasis added).[11]

A decision of this court is in accordance with the foregoing principles. In *Aetna Ins. Co. v. Fidelity & Cas. Co. of New York*, 483 F.2d 371 (5th Cir. 1973), American Insulation contracted to perform certain work at a Winn Dixie warehouse and one of the

---

and under existing case law Rossmoor may not benefit from the agreement if it is deemed actively negligent as Pylon and U.S. Fire claim. The trial court has found, however, that Rossmoor was at most passively negligent. We are not persuaded that this determination was erroneous." *Id*. at 104.

[11]Like the situation in *J. Walters Const. Inc.* (see note 9, *supra*), there is nothing in the *Rossmoor* opinion to indicate that the U.S. Fire policy provided coverage to Pylon for its potential liability to Rossmoor under the construction contract's indemnity clause.

American Insulation's employees was injured while performing that work and recovered a $68,500 judgment against Winn Dixie, which was found negligent. The contract required American Insulation to indemnify Winn Dixie for any claim arising from the presence or activity of American Insulation on Winn Dixie premises, even though caused by Winn Dixie's negligence. Winn Dixie paid the judgment against it and thereafter, in a separate suit, recovered judgment against American Insulation based on the indemnity agreement for $84,116.79, being the $68,5000 awarded in the employee's suit plus interest, costs and attorneys' fees. Aetna, which insured American Insulation, paid all this $84,116.79 judgment and then brought the present suit against Winn Dixie's liability insurer, Fidelity & Casualty Company, seeking to recover half of that payment. The court (apparently applying Florida law) held that Aetna was entitled to no recovery whatever because "[t]he Indemnity Agreement . . . controls all the rights and obligations of the parties and their privies (the insurers)", *id*. at 473, and accordingly the precise terms of the Aetna and the Fidelity & Casualty company insurance policies were "immaterial." *Id*. at 472. The same approach was taken in *Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.*, 982 F. Supp. 435 (S.D. Miss. 1997). There Coho, insured by Chubb under a $1 million general liability policy, was sued for $5.5 million by employees of Smith Brothers who were injured while performing Smith Brothers' work-over contract with Coho. The

20

contract required Smith Brothers to indemnify Coho for all claims and related attorney's fees arising out of the work. Smith Brothers's liability to Coho under the indemnity agreement was covered by its $1 million liability policy with Mid-Continent. In a declaratory judgment suit between these two insurers, Mid-Continent, relying on the identical "other insurance" clauses (essentially the same as those present here) in its and Chubb's respective policies, contended that Chubb was responsible for half of any liability and defense costs in the employees' suit. The court assumed *arguendo* that the terms of Mid-Continent and Chubb policies each purported to provide Coho primary coverage for purposes of the other insurance clauses, *id*. at 437 n.5, but held that the Mid-Continent "coverage must be exhausted before Chubb, as Coho's primary insurer, must provide any coverage or pay any portion of any award . . . against Coho" because "Smith Brothers is obligated to defend and indemnify Coho . . . consequently, Smith Brothers' insurers necessarily have the primary obligation to defend Coho relative to those claims, without regard to any insurance which Coho might have." *Id*. at 437. "To hold otherwise would render the indemnity contract between the insureds completely ineffectual . . . ." *Id*. at 438. The court relied on *Rossmoor* and *J. Walters Const. Inc.* and on our decision in *Aetna Ins. Co.*[12]

---

[12]Other authorities likewise support the same result. *Continental Cas. Co. v. Auto Owners Ins. Co.*, 238 F.3d 941 (8th Cir. 2000), was a declaratory judgment action to determine which insurer was liable for funds paid to settle a personal injury suit brought against Burlington

21

In *Reliance National Indemnity v. General Star Indemnity*, 72 Cal. App. 4th 1063, 85 Cal Rptr. 2d 627 (Cal. App. 1999), two

---

Northern by an employee of Fitzsimmons injured while performing Fitzsimmons's contract with Burlington Northern.  That contract required Fitzsimmons to indemnify Burlington Northern against all claims arising out of the contract work; it also required Fitzsimmons to pay for liability insurance covering Burlington Northern in respect to such claims.  The policy procured pursuant to this provision was that of Interstate Fire and Casualty which named Burlington Northern as an insured (but did not cover Fitzsimmons, although Fitzsimmons paid for it).  Fitzsimmons was insured under a CGL policy issued by Auto Owners Insurance Company which included coverage of sums Fitzsimmons became obligated to pay as damages for bodily injury by virtue of the indemnity provisions of its contract with Burlington Northern.  The court, apparently applying Minnesota law, noted that "both Interstate and Auto Owners covered the amount Burlington Northern agreed to pay under the settlement," *id*. at 944, and held that "Interstate, being subrogated to Burlington Northern's rights, can reach Fitzsimmons and, through it, Fitzsimmons's CGL carrier, Auto Owners. . . . we hold that Auto Owners is obligated to bear the entire loss." *Id*. at 945. *See, also:  Pacific National Ins. Co. v. Transport Ins. Co.,* 341 F.2d 514, 516, 520 (8th Cir. 1965) (Transport insured Superior, lessee of truck driven in Superior's business by Fred, an employee of the lessor; Transport paid the entire judgment against Superior for injury to a third party caused by Fred's negligence in connection with truck; Pacific insured the lessor and Fred. Transport was held entitled to recover the full amount of judgment from Pacific without any proration on the basis of the respective limits of the Pacific and Transport policies, and without regard to the co-insurance, excess or pro rata provisions of Pacific's policy, because Superior, whose liability was entirely vicarious, was entitled to common law indemnity from Fred, and Transport was subrogated to Superior's rights against Fred and Pacific as Fred's insurer; it was immaterial that there was no prior judgment awarding Superior indemnity against Fred); *Carolina Cas. Ins. Co. v. Transport Indemnity Co.*, 488 F.2d 790, 794 (10th Cir. 1973) (the Carolina policy covered the truck's lessor, its lessee, Ringsby, and its driver, Freeze, but provided that while the truck was leased coverage was excess over any other applicable insurance; the Transport policy covered only Ringsby; with respect to a third party tort suit against lessor, lessee and driver, arising out of Freeze's operation of the truck while leased to Ringsby, "Ringsby's liability, if any, is vicarious [of Freeze]; if Ringsby should be found liable it would have the right to proceed by indemnification against Freeze.  As Ringsby's subrogee, Transport could sue Freeze, a permissive user under Carolina's policy, ultimately recovering against Carolina.  Based on the above, and *to avoid a circuity of action*, we hold Carolina's policy to be *primary*;" emphasis added); *Maryland Cas. Co. v. Employers Mut. Liability Ins. Co.*, 208 F.2d 731 (2d Cir. 1953).

*Aviles v. Burgos*, 783 F.2d 270 (1st cir. 1986), is not to the contrary.  There, Travelers, insurer of the lessor-indemnitee, could not avoid sharing liability with CIS, insurer of the lessee-indemnitor, because the lessee was an additional insured in Travelers's policy, so Travelers could not subrogate against the lessee, and because the CIS policy expressly excluded coverage of liability assumed by contract. *Id*. at 279-81.

22

liability insurance companies, Reliance and General Star, disputed the share each should bear of sums paid in settlement of an underlying personal injury suit against Lollapalooza and Law by patrons injured at a concert performed by Lollapalooza pursuant to a contract with Law. The contract (governed by California law) required Law to procure liability insurance protecting Lollapalooza from such claims and also required Law to indemnify Lollapalooza from any such claim which "does not result from the active negligence of" Lollapalooza. Reliance insured Lollapalooza (but not Law) under a $1 million primary policy, with "other insurance" provisions similar to those present in the AIL and TPC policies here, and also under a $1 million excess policy. Lollapalooza was also covered as an additional insured under two policies naming Law and procured by it pursuant to the contract, namely a $1 million primary policy issued by Gulf and a $10 million excess policy issued by General Star. The underlying suit was settled, without a determination of fault on the part of either defendant or of whether Law was obligated to indemnify Lollapalooza, for $2,142,858, $1 million paid by Gulf, $1 million by Reliance under its primary policy and $71,429 by Reliance under its excess policy, and $71,429 by General Star under its excess policy. Reliance, invoking the decision in *Rossmoor*, claimed it was entitled to have Gulf and General Star bear the entire loss because Lollapalooza, Reliance's sole insured, was entitled to indemnity from Law, an

23

insured of Gulf and General Star. Reliance settled with Gulf and sued General Star. The Court of Appeals affirmed the trial court's summary judgment that Reliance was entitled to no recovery from General Star, because the General Star policy was expressly entirely "excess to all other insurance." *Id*., 72 Cal. App. 4th at 1076. The Court of Appeals distinguished *Rossmoor* stating "under both the relevant policies, Reliance's obligation was primary and General Star's was excess . . . . This is a materially distinguishing characteristic between the present litigation and *Rossmoor*" and that was "particularly true in this case because General Star's policy specifically states: 'Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance, reinsurance or *indemnity*'." *Id*. at 1081. The court went on to note that "[t]he risks involved in providing primary coverage are different from those involved in issuing an excess policy. These differences are reflected in part in the premium costs." *Id*. at 1082.

We conclude that *Reliance* does not support AIL's position here for two reasons: first, AIL's policy is unquestionably a primary policy, while General Star's policy in *Reliance* was expressly an excess policy; second, AIL's policy expressly covers Elite's liability to Caddell under the subcontract's indemnity provision,

24

while General Star's policy excluded such coverage.[13]

*No Determination of Caddell's Fault*

AIL argues that Elite's agreement to indemnify Caddell is not enforceable because it has not been determined, in this case or otherwise, that Alas's injury was not solely due to Caddell's negligence or fault.[14] However, such a determination is not necessary to the enforceability of the subcontract's indemnity provision. On the contrary, the agreement by its express terms "shall *not* be enforceable if, and *only if*, it be determined by judicial proceedings that the injury, death, or damage complained of was attributable solely to the fault or negligence of" Caddell (emphasis added). Since it is undisputed that there has been no such determination and since the "*only*" circumstance in which the agreement "shall *not* be enforceable" thus does not exist, the agreement *is* enforceable. AIL argues that it is unfair to impose on it the obligation to procure a judicial determination that Caddell was solely at fault because it could not do so in, or during the pendency of, the Alas litigation for fear of prejudicing the rights of its additional insured Caddell. However that may be,

---

[13]In *Wal-Mart Stores*, the court noted this latter factor as one making "*Reliance* unpersuasive authority for the present case." *Wal-Mart Stores* at 592. We also note that *Wal-Mart Stores* concluded that "*Reliance* is in the minority" and conflicts with *Rossmoor*, which "is better reasoned." *Wal-Mart Stores* at 591, 592.

[14]AIL does not otherwise question that the Alas suit and its settlement falls within the terms of the subcontract's indemnity provision.

AIL could certainly have instituted a declaratory judgment action against TPC at least as soon as the Alas suit settled. Instead, AIL waited to do so for nearly a year, despite having known of the indemnity agreement for at least a year and a half (if not longer) before the Alas suit settled (see note 5 *supra*). And, in the present suit AIL has never sought a determination that Alas's injury was solely due to Caddell's fault. In this connection, AIL relies on *Travelers Cas. & Surety Co. v. American Equity Ins. Co.*, 93 Cal. App. 4th 1142, 113 Cal. Rptr. 2d 613 (Cal. App. 2001). There, Travelers, following its settlement of an underlying lawsuit, sought contribution from American Equity for defense costs based on the "other insurance" clauses present in both policies. American Equity, on the other hand, asserted that the indemnity agreement was controlling. The California Court of Appeals held that Travelers had a right to equitable contribution from American Equity under the "other insurance" clauses, despite the indemnity clause. *American Equity* is not controlling because, unlike California law, Texas law does not require that a finding of fault be made.[15] The indemnification agreement in *American Equity* called for the property manager to be indemnified and did not contain an exception for cases in which the manager was negligent. The court

---

[15]*See, e.g., Rossmoor*, 13 Cal.3d at 628 (noting that "while such clauses may be construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, they will not be interpreted to provide indemnity if an indemnitee has been *actively* negligent"). See also note 10, *supra*.

in *American Equity* distinguished *Rossmoor* in part based on California's law requiring a determination that the indemnitee was not actively negligent:

> "More importantly, subrogation of the insurer to the rights of the insured presupposes the insured, Preferred Capital, has a right to indemnity from the receiver or from Lakeview under the indemnity agreement. This determination was never made below and those parties (the receiver, Lakeview and Preferred Capital) are not parties to this action. Were Preferred Capital to seek indemnity directly from the receiver or from Lakeview under the agreement, it might be shown that Preferred Capital was not entitled to indemnity on the grounds that it was actively or intentionally negligent in causing the victim's injury." *American Equity Ins. Co.*, 93 Cal. App. 4th at 1157.

Thus, absent such a finding, the default position in California favors the party seeking to avoid indemnification. In contrast, Texas law only requires that the express negligence doctrine and conspicuousness requirement be met. See note 7, *supra*. As Texas law does not demand such a finding of active-passive negligence, we default instead to the language of the indemnity provision, which, as above noted, makes it clear that, absent a judicial determination of sole fault or negligence on the part of Caddell, indemnification is required. Further, in *American Equity* it does not appear that the Travelers policy covered any of the indemnitor's obligations under the indemnity agreement.

We reject Alas's contentions in this regard.

*AIL's defense costs*

AIL's final contention is that TPC should at least be

27

obligated to share its expenses in defending the Alas litigation since, according to AIL, the "insured contract" provisions of its policy (see note 3 *supra*) did not insure Elite against its liability under the indemnity agreement to reimburse Caddell for Caddell's expenses and attorneys' fees in defending the Alas suit (although AIL recognizes that its policy did insure Elite against its liability under the agreement to reimburse Caddell for sums Caddell might pay the Alas plaintiffs to discharge or settle the claims against Caddell in the Alas suit). We assume, *arguendo*, that AIL is correct in its above stated analysis of the scope of the "insured contract" coverage which its policy afforded Elite, but we nevertheless reject its contention that this entitles AIL to recover from TPC half its (AIL's) attorneys' fees and related costs in defending Caddell in the Alas suit, and we conclude that Texas courts would likewise reject that contention.

We note to begin with that many of the above cited cases which have ruled in favor of the indemnitee's insurer, and against the indemnitor's insurer, have done so without any indication that the indemnitor's insurer's policy covered to *any* extent the indemnitor's contractual indemnity obligation to the indemnitee. *See, e.g., J. Walters Construction Inc.; Rossmoor.*

Further, AIL does not cite any cases holding that where two liability insurers cover a suit against a given insured, and as between the two insurers one is obligated for the entire amount

28

paid in settlement of the claim, that nevertheless the insurer so obligated is entitled to recover from the other insurer any part of the costs of defending the action. Nor are we aware of any such holding. It appears to us that to so hold would run counter to the general rule, well established in Texas, that "the excess liability insurer is not obligated to participate in the defense until the primary limits are exhausted." *Keck, Mahin & Cate v. National Union Fire Ins. Co.*, 20 S.W.3d 692, 700 (Tex. 2000) (internal quotation marks omitted); *Schneider National Transport v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2000); *Texas Employers Ins. v. Underwriting Members*, 836 F. Supp. 398, 404 (S.D. Tex. 1997). This is so even though the lawsuit is one for an amount in excess of the primary limits, so long as it is settled (or results in a judgment which is discharged) for an amount not in excess of the primary policy limits. *Keck* at 701; *Texas Employers Ins.* at 408-09. *See also Signal Companies Inc. v. Harbor Ins. Co.*, 27 Cal. 3d 359, 612 P.2d 889, 19 A.L.R. 4th 75, 83 (Cal. 1980) ("where there is excess coverage, whether by virtue of an excess clause in one policy *or otherwise*, it is the primary insurer which is solely liable for the costs of defense if the judgment does not exceed primary coverage", emphasis added); *Bettenburg v. Employers Liability Assurance Corp.*, 350 F. Supp. 873, 877-78 (D. Minn. 1972) (for these purposes policy deemed excess, even though not so by its own terms or other insurance clauses, where it provided only

29

general coverage and other policy provided only specific coverage of the particular risk at issue). Here, by virtue of the indemnity agreement obligating Elite to pay Caddell any amount Caddell paid the Alas plaintiffs to settle the Alas suit or discharge any judgment therein, and by virtue of AIL's $1 million policy insuring Elite against such liability to Caddell, AIL may not recover from TPC, which insured only Caddell and would be subrogated to its rights against Elite, any portion of the $625,000 which AIL, whose policy named Elite as insured and Caddell as an additional insured (as required by the subcontract), paid the Alas plaintiffs to settle the suit.[16] That being the case, it is proper, for purposes of determining whether AIL is entitled to have TPC bear a portion of the defense costs in the Alas lawsuit or whether as between AIL and TPC all such costs should be borne by AIL, to regard AIL as having the primary coverage, and TPC only excess coverage over that

---

[16]That such result would obtain even if AIL's policy, though generally covering Elite, did not cover any of Elite's contractually assumed liability to Caddell, is indicated by the decisions in *J. Walters Construction Inc.* and *Rossmoor.* We need not, and do not, decide that question however, because AIL's policy *does* insure Elite against liability to Caddell under the indemnity agreement for sums Caddell would pay the Alas plaintiffs in settlement of,or to discharge a judgment in, the Alas lawsuit (whether or not AIL's policy *also* insures Elite's indemnity agreement obligation to reimburse Caddell for expenses incurred by Caddell in defending the Alas suit). If TPC, as Caddells' insurer (under a policy not covering Elite), were required to pay AIL half the $625,000 that AIL paid the Alas plaintiffs to settle their suit against Caddell, then TPC, being subrogated to Caddell's rights, could by virtue of the indemnity agreement recover judgment against Elite for that $312,500, and Elite in turn, or TPC as Elite's judgment creditor, could then recover that $312,500 back from AIL by virtue of AIL's policy insuring Elite against that liability, all with the ultimate result that AIL would bear 100% of all the money ($625,000) paid to the Alas plaintiffs to settle their suit against Caddell and TPC would bear no portion thereof.

of AIL, respecting the Alas suit.  As stated in *Wal-Mart Stores* "the labels 'primary' and 'excess' are shorthand for priority of payment obligations," *id*. at 592, and

> "[w]hether the parties are termed 'primary' or 'excess' depends on who is required to pay first, and that is the question presented here . . . . RLI cannot avoid liability for the settlement by pointing to language in its policy calling itself 'excess.'  RLI is 'excess' to National Union only if we determine that National Union is liable first, and, as explained above, we do not do so because we believe the indemnity agreement governs." *Id*. at 590.

That language applies *a fortiori* here because the AIL policy does not purport to be an "excess" policy but rather purports to provide primary coverage to Caddell (as well as to Elite).[17]  *See also Rossmoor supra* at 99, 105 (affirming trial court holding that the indemnitee's policy "was merely *excess*" and stating that "the trial court was correct in finding that" the indemnitor's policy "must be viewed as *primary insurance*;" emphasis added); *Carolina Cas. Ins. Co., supra* at 794, "to *avoid a circuity of action*, we hold Carolina's [indemnitee's] policy to be *primary*;" emphasis added).  For all these reasons, we conclude that AIL is not entitled to recover from TPC any portion of the costs of defending the Alas lawsuit.[18]

---

[17]Accordingly, we need not and do not generally decide whether or under what circumstances it is proper to treat as "primary" a policy which expressly purports to be only an excess policy. *Cf. Reliance*.

[18]This result also has the further advantage of avoiding a multiplicity of suits (if TPC, as Caddell's insurer, were required to pay AIL a portion of AIL's costs of defending the Alas suit,

31

## Conclusion

The district court correctly granted summary judgment denying AIL any recovery from TPC.  The judgment is accordingly

AFFIRMED.

---

then TPC, subrogated to the rights of its insured Caddell under the indemnity agreement, could recover the amount so paid by suing Elite, whom TPC did not insure), and also avoiding a situation where AIL, by recovering part of its defense costs from TPC, has caused those costs to be ultimately borne by the named insured (Elite) in AIL's own policy which Elite procured and paid for pursuant to the subcontract (an arguably unusual result even though we assume, *arguendo*, that AIL's policy did not cover such a defense cost liability of Elite under the indemnity agreement).