IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2007

Charles R. Fulbruge III
Clerk

No. 06-11283

NATIONWIDE BI-WEEKLY ADMINISTRATION, INC.,

Plaintiff-Appellant

v.

BELO CORP., THE DALLAS MORNING NEWS, AND SCOTT BURNS

Defendants-Appellees.

Appeal from the United States United States District Court
for the Northern District of Texas

Before DeMOSS, DENNIS, and OWEN, Circuit Judges.

DeMOSS, Circuit Judge:

Nationwide Bi-Weekly Administration ("Nationwide") brought defamation and related claims against Belo Corp., THE DALLAS MORNING NEWS, and writer Scott Burns (collectively referred to as "Belo") based on an allegedly defamatory article that appeared in THE DALLAS MORNING NEWS. The district court granted Belo's Rule 12(b)(6) motion to dismiss on statute of limitations grounds and Nationwide appealed to this court. For the reasons stated below, we affirm.

I.

On July 29, 2003, THE DALLAS MORNING NEWS published an article criticizing a particular mortgage program offered by Nationwide. The article first appeared in a financial column written by Scott Burns in the newspaper's print

edition and was subsequently made available on its website. THE DALLAS MORNING NEWS website is readily accessible on the Internet by entering the proper Internet address or by using a standard Internet search engine.

Based on the article, Nationwide filed suit in Ohio state court on July 28, 2004 against Belo, alleging defamation, tortious interference with prospective business relations, and business disparagement. However, Nationwide did not serve Belo until June 2005.

Upon being served, Belo removed to the United States District Court for the Southern District of Ohio where it brought a timely motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) and for failure to state a claim pursuant to Rule 12(b)(6). Before the court ruled on Belo's motion, Nationwide moved to transfer the case to the Northern District of Texas, where it could exercise personal jurisdiction over Belo. By order dated March 28, 2006, the Ohio District Court granted Nationwide's motion and transferred the case to the Northern District of Texas pursuant to 28 U.S.C. § 1406(a). That section permits a court to transfer a case "to any district or division in which it could have been brought" regardless whether it has personal jurisdiction over the defendants. 28 U.S.C. § 1406(a); Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962).

After the suit was docketed in the Northern District of Texas, Belo brought a Rule 12(b)(6) motion to dismiss on May 30, 2006, arguing that Nationwide's suit violated the statute of limitations. The district court granted the motion and dismissed the case. Nationwide timely appealed.

## II.

## A. Standard of Review

We review de novo the district court's dismissal for failure to state a claim under Rule 12(b)(6). Frank v. Delta Airlines Inc., 314 F.3d 195, 197 (5th Cir. 2002). Dismissal under Rule 12(b)(6) is appropriate when the plaintiff has failed

to allege "enough facts to state a claim to relief that is plausible on its face" and fails to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965, 1974 (2007). We proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965. However, "[w]e review the district court's administrative handling of a case, including its enforcement of the local rules and its own scheduling orders for abuse of discretion." Macklin v. City of New Orleans, 293 F.3d 237, 240 (5th Cir. 2002).

## B. Procedural Issues

Nationwide argues that Belo's Rule 12(b)(6) motion to dismiss, filed on May 30, 2006 in the Northern District of Texas, was procedurally barred because (1) it was untimely, and (2) Belo failed to consolidate its defenses in one motion as required by Rule 12(g).

Nationwide first argues that Belo's motion was barred because it was untimely under rules setting deadlines for filing responsive Rule 12(b) motions or pleadings by defendants. The Northern District of Texas received this case from the Southern District of Ohio on April 4, 2006, and Belo filed its Rule 12(b)(6) motion on May 30, 2006. Nationwide contends that, assuming the transfer to the Northern District of Texas constituted a re-filing and re-serving of their complaint, Belo's motion was untimely under Rule 12(a)(1)(A). See FED. R. CIV. P. 12(a)(1)(A) (requiring a defendant to serve an answer "within 20 days after being served with the summons and complaint"). Construing this rule as requiring Belo to file either an answer or a Rule 12(b) motion within 20 days of the transfer, Nationwide contends that Belo's May 30th motion was untimely. Nationwide cites no authority for the proposition that transfer of a case under § 1406(a) constitutes a re-filing of the case in the transferee court. We find such a contention untenable. Nothing in the statutory language of 28 U.S.C. § 1406(a) suggests that transfer should be treated as a re-filing. Further, when cases are

transferred from one district to another, all docket entries are transferred and all pending motions remain pending.

Nationwide's other arguments relating to the timeliness of Belo's Rule 12(b)(6) motion also lack merit. Nationwide contends that Belo's Rule 12(b)(6) motion was untimely under Rule 12(a)(4)(A), which provides "if the court denies [a Rule 12(b) motion] or postpones its disposition until the trial on the merits, the responsive pleading shall be served within 10 days after notice of the court's action." FED. R. CIV. P. 12(a)(4)(A). Application of Rule 12(a)(4)(A) is triggered when the court (1) denies a motion or (2) postpones disposition of a motion until trial. See id. Neither the Ohio or the Texas district court denied or postponed disposition of any Rule 12(b) motion, so that section is inapposite.

Nationwide also asserts that Rule 81(c) renders Belo's motion untimely. Rule 81(c) provides that when a defendant removes an action to federal court before answering a complaint, the defendant has twenty days from receipt of the initial pleading or service, or five days after filing a notice of removal, whichever is longer, to file a responsive pleading or motion. FED. R. CIV. P. 81(c). Contrary to Nationwide's argument, Rule 81(c) merely set the deadline for Belo to make its first responsive pleading or motion after removal. See id. Belo satisfied Rule 81(c) by timely filing a responsive motion in the Ohio District Court.

Having concluded that Belo's Rule 12(b)(6) motion was not untimely under any of the rules cited by Nationwide that set deadlines for responsive pleadings and motions, we turn to Nationwide's argument that Belo failed to consolidate its defenses as required by Rule 12(g). Rule 12(g) provides in relevant part: "If a party makes a motion under this rule but omits therefrom any defense or objection then available . . . the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2)." FED. R. CIV. P. 12(g). Nationwide argues that Belo failed to consolidate its personal jurisdiction and statute of limitations defenses in the same Rule

12(b) motion. However, Rule 12(g) did not require consolidation here because Rule 12(h)(2) explicitly excepts from the consolidation requirement motions based on the defense of failure to state a claim upon which relief can be granted. See id. at 12(h)(2).[1] In sum, we find that the district court did not abuse its discretion by considering Belo's Rule 12(b)(6) motion.

## C. Substantive Issues

### i. Statute of Limitations

Belo's Rule 12(b)(6) motion sought dismissal of Nationwide's claims on statute of limitations grounds. See Jones v. Alcoa, Inc., 339 F.3d 359, 366 (5th Cir. 2003) (noting that a statute of limitations defense may be properly asserted in a Rule 12(b)(6) motion). The parties do not dispute that the Texas statute of limitations applies to this suit transferred from the Southern District of Ohio to the Northern District of Texas pursuant to 28 U.S.C. § 1406(a), and we agree. "[F]ollowing a section 1406(a) transfer, regardless of which party requested the transfer or the purpose behind the transfer, the transferee court must apply the choice of law rules of the state in which it sits." Ellis v. Great Sw. Corp., 646 F.2d 1099, 1110 (5th Cir. Unit A Jun. 1981). Applying the Texas choice of law rules, we conclude that Texas has the "most significant relationship" to this dispute and thus, Texas substantive law applies. See id. at 1111 (noting that Texas has adopted the "most significant relationship test" to determine which state's substantive law applies). Further, when Texas substantive law applies, "there is no question . . . that Texas courts would apply their own state's statute of limitations." Id. at 1112.

---

[1] Relatedly, Nationwide argues that Belo's statement that Nationwide "obviously has an interest in obtaining relief, but that relief can be had in Texas" should equitably estop Belo from asserting a statute of limitations defense in Texas. However, that statement was made in connection with Belo's Rule 12(b)(2) motion as part of a discussion concerning personal jurisdiction. We decline to read this statement out of context and find that Belo has conceded that Nationwide could successfully bring suit in Texas. At most, this statement could be interpreted as conceding personal jurisdiction in Texas.

Texas has adopted a one-year statute of limitations for libel claims. See TEX. CIV. PRAC. & REM. CODE § 16.002(a). The one-year limitations period begins to run when publication of the libelous statement is complete, which is "the last day of the mass distribution of copies of the printed matter." Holloway v. Butler, 662 S.W.2d 688, 692 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). "On that date, the publisher of the statement has made the libelous matter available to his intended audience and the tort is complete." Stephan v. Baylor Med. Ctr. at Garland, 20 S.W.3d 880, 889 (Tex. App.—Dallas 2000, no pet.). Because the period begins to run on the date the publication is complete, this rule is commonly referred to as the "single publication rule." See id.; see also Williamson v. New Times, Inc., 980 S.W.2d 706, 710 (Tex. App.—Fort Worth 1998, no pet.).

An important purpose of the single publication rule is to prevent plaintiffs from bringing stale and repetitive defamation claims against publishers. See Holloway, 662 S.W.2d at 691. As a result, retail sales of individual copies after the publication date and sales of back issues do not trigger a new limitations period. Id. at 692. However, separate printings of the original content are considered subsequent publications. Stephan, 20 S.W.3d at 889 (reasoning that in the case of separate printings "it is apparent that the publisher intends to reach different audiences and this intention justifies a new cause of action").

It is uncontested that THE DALLAS MORNING NEWS published the allegedly defamatory article in its July 29, 2003 print edition, and that Nationwide filed its complaint on July 28, 2004—within the allowed period. However, "the mere [timely] filing of a suit will not interrupt or toll the running of a statute of limitation; to interrupt the statute, the use of diligence in procuring the issuance and service of citation is required." Ellis, 646 F.2d at 1112 (internal quotation marks omitted) (applying Texas law). Nationwide failed to serve Belo until June 2005, more than 10 months after filing suit. The district court, citing this

lengthy and unexplained delay, found that Nationwide failed to exercise due diligence in serving Belo and dismissed the suit on statute of limitations grounds. See id. at 1114 (surveying Texas cases and concluding that "unexplained delay of as little as six months demonstrates as a matter of law that the plaintiff lacked diligence in obtaining the issuance and service of process.").

On appeal, Nationwide does not appear to challenge the proposition that, if its claim rested solely on publication of the article in the print edition, its claim is barred. Nationwide instead argues that the article's availability on THE DALLAS MORNING NEWS website mandates a different result. This is so, according to Nationwide, because each time a viewer accesses the article from the website a "republication" occurs for statute of limitations purposes. This concept, widely argued but virtually always rejected, is referred to as the "continuous publication rule."

### ii. Continuous Publication Rule and Internet Publication

As mentioned, Texas applies the single publication rule to libel cases involving mass media publications. Holloway, 662 S.W.2d at 692. However, Texas courts have not yet considered whether the single publication rule should apply to Internet publications. Accordingly, this court is "required to follow the rule we believe the Texas Supreme Court would adopt." Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co., 335 F.3d 429, 435 (5th Cir. 2003). "[I]n making [our] Erie guess, we consider, among other sources, treatises, . . . decisions from other jurisdictions . . . and the majority rule." Id. (internal quotation marks omitted). We may also consider Texas public policy interests.

In this case, decisions from other jurisdictions prove the most instructive.[2] In considering decisions from other jurisdictions, we have found only one that applied the continuous publication rule. See Swafford v. Memphis Individual Practice Ass'n, No. 02A01-9612-CV-00311, 1998 WL 281935, at *8 (Tenn. Ct. App. June 2, 1998). Nationwide believes the Texas Supreme Court would be inclined to follow Swafford's lead and hold that each time a reader accesses the article on THE DALLAS MORNING NEWS website a new publication occurs. However, our reading of Swafford and subsequent cases fails to persuade us that Texas would adopt its holding here.

Swafford involved a restricted-access online database containing information about individual doctors. Id. at *1. The database allegedly provided defamatory information about an individual doctor to health care facilities who requested his information. Id. The Tennessee Court of Appeals, reasoning that the database limited access to authorized users and only released information in response to "an affirmative request by a hospital," refused to apply the single publication rule. Id. at *5, *8. The court noted that no "aggregate publication" occurs when users of the database request information, and thus, "the justification for the single publication rule, a vast multiplicity of lawsuits resulting from a mass publication, is simply not present." Id. at *8.

---

[2] This is not to say that secondary sources are silent on this issue. See, e.g., 50 AM. JUR. 2D Libel § 245 ("The single-publication rule applies to internet publishing."). Several law review comments also discuss the issue. Compare Sapna Kumar, Comment, Website Libel and the Single Publication Rule, 70 U. CHI. L. REV. 639, 662 (2003) (recognizing potential abuses of the rule in the Internet context, but advocating for its extension as long as the "website is truly available to the public") and Lori A. Wood, Note, Cyber-Defamation and the Single Publication Rule, 81 B.U. L. REV. 895, 913-14 (2001) (advocating application of the single publication rule to generally accessible Internet sites) with Odelia Braun, Comment, Internet Publications and Defamation: Why the Single Publication Rule Should Not Apply, 32 GOLDEN GATE U. L. REV. 325, 332-37 (2002) (arguing against application of the rule to the Internet).

Swafford is factually distinguishable from the case at bar. The information at issue in Swafford was not publicly available and "could hardly be considered an aggregate communication comparable to typical Internet publication." Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122, 1133 (9th Cir. 2006) (internal quotation marks omitted) (discussing Swafford). In contrast, the article at issue here was undisputably posted on the website and made widely available to the public via the Internet. This distinction is material because, as Swafford itself noted, a primary purpose of the single publication rule is to prevent the multiplicity of suits that may follow widespread dissemination. See Swafford, 1998 WL 281935, at *8.

In addition to this factual distinction, we are influenced by the fact that apparently no court has followed Swafford. However, a number of cases have refused to follow Swafford and have applied the single publication rule to Internet publications. Of these, perhaps the most influential is Firth v. State, 775 N.E.2d 463, 466 (N.Y. 2002).

In Firth, the plaintiff sued the publisher of an investigative report that was published on the Internet. Id. at 464. The plaintiff argued that because the report was constantly available on the Internet, each day resulted in a new publication of the report. Id. at 465. The New York Court of Appeals, after considering the competing policy arguments, held that "a multiple publication rule would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants." Id. at 466. Further, the court recognized that if it applied the continuous publication rule "[i]nevitably, there would be a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise." Id. Thus, the court held the single publication rule applies to Internet publications. Id.

Every court to consider the issue after Firth has followed suit in holding that the single publication rule applies to information widely available on the Internet. See, e.g., Oja, 440 F.3d at 1133; Van Buskirk v. New York Times Co., 325 F.3d 87, 89 (2d Cir. 2003); Mitan v. Davis, 243 F. Supp. 2d 719, 724 (W.D. Ky. 2003); Churchill v. State, 876 A.2d 311, 316 (N.J. Super. Ct. App. Div. 2005); McCandliss v. Cox Enters., 593 S.E.2d 856, 858 (Ga. Ct. App. 2004); Traditional Cat Ass'n, Inc. v. Gilbreath, 13 Cal. Rptr. 3d 353, 361-62 (Cal. Ct. App. 2004).[3] Given that every case to consider the issue has applied the single publication rule to publicly available Internet articles, it is clearly the majority approach. See Churchill, 876 A.2d at 316 (agreeing with the "almost unanimous" view of other courts that the single publication rule applies to Internet publications); see also Kumar, 70 U. CHI. L. REV. at 650 ("The idea that publication on the Web and traditional print publishing are similar enough to merit application of the single publication rule is not controversial."). Furthermore, we find the rationale behind the widespread acceptance of the single publication rule in the Internet context persuasive.

For example, some courts have reasoned that the "functional similarities between print and Internet publication" support application of the single publication rule to both types of media. Oja, 440 F.3d at 1131; see also Firth, 775 N.E.2d at 465 ("Communications accessible over a public Web site resemble those contained in traditional mass media, only on a far grander scale."). As one court noted, "A statement electronically located on a server which is called up when a web page is accessed, is no different from a statement on a paper page in a book lying on a shelf which is accessed by the reader when the book is opened." Mitan, 243 F. Supp. 2d at 724. While we recognize that important differences exist between print media and the Internet, we agree that the

---

[3] We note that this is not an exhaustive list of all cases to have applied the single publication rule to Internet publications.

similarities between the two media support application of a consistent rule. See Oja, 440 F.3d at 1130-31.

Nationwide attempts to distinguish Internet publication, where editors can easily alter or remove content, from print media where publishers "relinquish all right of control, title, and interest in the printed matter" upon publication. New Times, 980 S.W.2d at 710. In Oja, the Ninth Circuit rejected a similar argument:

> It is true that an Internet publisher may have greater control over the availability of content posted on its server than a print publisher has over its printed stock; however, that fact alone does not corrupt the analogy between Internet and print publication, given that the single publication rule generally applies to books in a publisher's stock that could have been withdrawn following their initial availability for sale but were not.

Oja, 440 F.3d at 1131 n.10.

In other words, a website's control over its content is akin to a publisher's control over its stock. See id. When a publisher continues to make an allegedly defamatory book available from its stock, courts have held that action does not constitute republication, even though the publisher could have withdrawn the book. Van Buskirk v. New York Times Co., No. 99 Civ. 4265(MBM), 2000 WL 1206732, at *2 (S.D.N.Y. 2000), aff'd, 325 F.3d 87 (2d Cir. 2003). Likewise, the continued availability of an article on a website should not result in republication, despite the website's ability to remove it.

Perhaps more important than the similarities between print media and the Internet, strong policy considerations support application of the single publication rule to information publicly available on the Internet. See Firth, 775 N.E.2d at 466 (discussing the "potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants" and warning of a corresponding chilling effect on Internet communication). We agree that these policy considerations favor application of the single publication rule here

11

and we note that application of the rule in this context appears consistent with the policies cited by Texas courts in adopting and applying the single publication rule to print media: to support the statute of limitations and to prevent the filing of stale claims. See Holloway, 662 S.W. 2d at 691.

Nationwide points out several competing public policy arguments. First, "the publication of defamatory and private information on the web has the potential to be vastly more offensive and harmful than it might otherwise be in a more circumscribed publication." See Oja, 440 F.3d at 1129. To the extent this argument is based on the fact that more people will be exposed to Internet publications because those publications are likely accessible for a potentially indefinite period, we feel it is outweighed by the competing policy interests of enforcing the statute of limitations and preventing stale claims. See Holloway, 662 S.W. 2d at 691. To the extent this argument is premised on the fact that an Internet publication has the potential to reach more people because of broader readership (without any temporal component), it is likely relevant only to the issue of damages, not to the triggering of the statute of limitations.

Nationwide also argues that (1) Texas courts have a policy of recognizing continuing torts, especially in trademark infringement cases, which it argues are analogous, see Two Pesos, Inc. v. Gulf Ins. Co., 901 S.W.2d 495, 500 (Tex. App.—Houston [14th Dist.] 1995, no writ), and (2) that Texas courts have a policy of holding the media to a standard of truthfulness. See Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 421 (Tex. 2000). Even assuming these propositions are true as a general matter, we need not look to general themes in Texas law for guidance when Texas courts have stated clear policy reasons for applying  the single publication rule to mass media. We find those reasons persuasive in this context as well.

Based on the near unanimity of the large number of courts to apply the single publication rule to Internet publications, the fact that the only case to

hold otherwise (Swafford) is distinguishable, and because sound policy reasons support its application in this context, we hold that the Texas Supreme Court would likely adopt the single publication rule for Internet publications.

Applying the single publication rule here, the statute of limitations began to run on July 29, 2003, the date the initial print publication was complete. See Stephan, 20 S.W.3d at 889. The only remaining issue is whether posting the article on THE DALLAS MORNING NEWS website constituted a republication giving rise to a new statute of limitations.

As noted above, the single publication rule provides that when an allegedly defamatory statement is published in a new format, such as when a hardcover book is republished in paperback form, it is considered "republished" and the statute of limitations begins to run from the date of republication. See Firth, 775 N.E.2d at 466 (citing RESTATEMENT (SECOND) OF TORTS § 577A cmt. d.); see also Holloway, 662 S.W.2d at 692 ("[W]e are not limiting a plaintiff to a single cause of action in the event the same information appears in separate printings of the same publication or in different publications."). "The justification for this exception . . . is that the subsequent publication is intended to and actually reaches a new audience." Firth, 775 N.E.2d at 466.

We need not decide whether posting this article on THE DALLAS MORNING NEWS website constituted a republication because, even if it did, dismissal was appropriate. If the posting of the article on the website resulted in a republication, the statute of limitations would begin to run from the date it was posted. Here it is almost certain that the article was posted on the website shortly after it appeared in the print edition, but the exact date of posting is not in the record. However, Nationwide concedes, through its attorney's affidavit, that the article was available online on April 4, 2004. See Bison aff. ¶ 5. Even assuming that the first day the article was available on the website was April 4, 2004, Nationwide's suit is time-barred.

Assuming Internet republication on April 4, 2004, the statute of limitations would begin to run on that date. Nationwide's complaint, filed on July 28, 2004, would have been timely. But recall that Nationwide did not serve Belo until June 2005, which is more than one year after April 4, 2004, and more than 10 months after filing the complaint. "If a plaintiff files suit within the limitations period, but serves the defendant after the limitations period has expired, the date of service relates back to the date of filing if the plaintiff exercises due diligence in obtaining service." See Auten v. DJ Clark, Inc., 209 S.W.3d 695, 698 (Tex. App.—Houston [14th Dist] 2006, no writ). We agree with the district court that Nationwide's more than 10-month unexplained delay in serving Belo was unreasonable as a matter of law, and thus, even under this generous scenario, dismissal was proper. See id. at 698-99.

iii. Nationwide's Business Disparagement and Tortious Interference Claims

In addition to its defamation claim, Nationwide brought claims for business disparagement and tortious interference with prospective business relations. A two-year statute of limitations typically applies to those causes of action. See TEX. CIV. PRAC. & REM. CODE § 16.003. However, when allegedly defamatory statements form the sole basis for a plaintiff's tortious interference claim, defamation's one-year statute of limitations applies. See Martinez v. Hardy, 864 S.W.2d 767, 776 (Tex. App.—Houston [14th Dist.] 1993, no writ). Likewise, Texas courts have applied a one-year statute of limitations to business disparagement claims when the gravamen of the complaint is defamatory injury to the plaintiff's reputation and there is no evidence of direct pecuniary loss to give rise to special damages. See Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766-67 (Tex. 1987). "If the damages alleged are primarily personal and general —e.g., injury to personal reputation, humiliation, or mental anguish —then the cause of action is one for libel or slander, even though incidental or

consequential professional losses are also pleaded and proved." New Times, 980 S.W.2d at 710-11.

We agree with the district court that the one-year statute of limitations applies. Regarding Nationwide's tortious interference claim, the court noted that Nationwide based the claim on the fact that "prospective customers have seen the false statements in the article." Thus, this claim is indistinguishable from Nationwide's defamation claim. See Proctor & Gamble Co. v. Amway Corp., 80 F. Supp. 2d 639, 657 (S.D. Tex. 1999), aff'd in part, reversed in part on other grounds, 242 F.3d 539 (5th Cir. 2001). Regarding the business disparagement claim, the district court held that Nationwide failed to provide any meaningful basis upon which to distinguish it from the defamation claim, and that Nationwide failed to allege any specific economic loss. We find no error in this conclusion.

III.

Finding that Nationwide's claims are barred by the statute of limitations, we AFFIRM the judgment of the district court.

AFFIRMED.